IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-02005-PAB-CBS

PATRICIA VILLALVA,

      Plaintiff,

v.

DILLON COMPANIES, INC. dba KING SOOPERS DIV,

      Defendant.

---

**ORDER**

---

    This case is before the Court on a Motion for Summary Judgment [Docket No. 18] filed by defendant Dillon Companies, Inc.  This Title VII case involves claims of gender discrimination, hostile work environment, and retaliatory discharge.  Jurisdiction is based on 28 U.S.C. § 1331.

## I.  BACKGROUND[1]

    Plaintiff Patricia Villalva began her employment with defendant in September 2002.  Docket No. 36 at 5, ¶ 1.  Plaintiff worked the night shift as an All Purpose Clerk at King Soopers Store 50, a grocery store located at 9800 W. Belleview Avenue in Littleton, Colorado, which was open 24 hours a day.  *Id.* at 6, ¶ 3.  Ms. Villalva was a member of the United Food and Commercial Workers, Local 7 (the "Union"), and a collective bargaining agreement ("CBA") between the Union and defendant governed certain terms and conditions of employment.  *Id.* at 5, ¶ 2.  The night shift crew at Store

---

[1]The following facts are undisputed unless otherwise indicated.

50 consisted of approximately thirteen employees, four of whom were foremen.  Docket No. 18 at 3, ¶ 10.  Ms. Villalva's co-workers, including foremen Ron Morales and Gary Daniels, were members of the Union.  Docket No. 18-18 at 2, ¶ 6.  Ms. Villalva claims to have been the only female on the night shift crew.  Docket No. 25 at 1, ¶ 4.

Defendant's Policies and Special Procedures employee manual ("Policy Manual") contained a provision addressing harassment, including sexual harassment. Docket No. 18 at 2, ¶ 5.  The Policy Manual provided several options for employees seeking to report harassment, which included reporting to named supervisors, store managers, district managers, and a toll-free telephone number.  *Id.*  The Policy Manual also contained a section called "Threats & Violence," which stated, in relevant part, "[v]iolence and threats of violence, either overt or implied, against associates, on or off Company property, will not be tolerated."  Docket No. 18-15 at 23.  The Policy Manual's "Misconduct" section stated, in relevant part, "[a]ll associates are expected to behave in a manner reflective of current laws, regulations and accepted social standards of behavior in the work place."  *Id.* at 19 (emphasis omitted).  Each of these sections contained a nearly identical provision stating that "[v]iolations of this policy will result in disciplinary action up to and including termination of employment."  *See id.* at 23.  The Policy Manual applied to Ms. Villalva, who understood her responsibility to read the manual and to comply with its policies.  Docket No. 36 at 6, ¶¶ 4, 8.

Ms. Villalva claims that various co-workers committed misconduct on several occasions in the time leading up to her termination.  Nine months before her termination, Ms. Villalva claims co-worker James Camargo stated to a customer that the back end of the store was no place for women and, on a separate occasion, said

2

"let a man do his work."  Docket No. 18 at 9, ¶¶ 63, 65.  Ms. Villalva claims Mr.

Camargo also banged on her car windows and told her that he did not get along with

females.  *Id.* at 7, ¶ 49.  In May 2009, Mr. Camargo allegedly struck Ms. Villalva three

times in the shin with a cart referred to as a "U-boat,"[2] but Ms. Villalva did not report the

incident.  *See* Docket No. 18 at 6, ¶¶ 38, 39.  In March 2010, Ms. Villalva claims that

Mr. Camargo hit her four times in one shift.  Docket No. 18 at 6, ¶ 40.  There is some

indication that Ms. Villalva reported this incident to Assistant Store Manager Alyssa

McNerney.  Docket No. 18-2 at 5, p. 232:5-9.[3]  Ms. Villalva admits that Mr. Camargo

fought both men and women at work.  Docket No. 18 at 7, ¶ 46.

At some point during her employment, Ms. Villalva claims that she overheard

night crew foreman Ron Morales tell a dirty joke about a man and a woman having sex.

Docket No. 18-6 at 3, p. 536:1-21.  However, in her deposition, Ms. Villalva could

provide no additional details.  *Id.*  There is no indication Ms. Villalva reported this

incident to store management.  In March 2010, Ms. Villalva reported to Ms. McNerney

that Mr. Morales was harassing her.  Docket No. 18 at 7, ¶ 44; Docket No. 25 at 2, ¶ 13.

Ms. McNerney states that, when asked for further details, Ms. Villalva stated that Mr.

Morales "always told her what to do" and never told anyone else what to do.  Docket

No. 18-21 at 1, ¶¶ 4-5.  In her affidavit, Ms. Villalva claims that she told Ms. McNerney

that Mr. Morales "didn't treat the men the same way."  Docket No. 25 at 2, ¶ 14.  This

---

[2]"U-boats," as they are referred to by the parties, are metal carriers used to
transport product.  Docket No. 18 at 3, 12.

[3]Citations to the Deposition of Patricia Ann Villalva denote the docket number
and page number(s), followed by the deposition page and line number(s) on which the
cited statement(s) appear.

3

was the extent of Ms. Villalva's complaint regarding Mr. Morales.  Ms. McNerney

determined that no sexual harassment had been alleged and took no further action.

Docket No. 18 at 7, ¶ 45; Docket No. 27 at 5, ¶ 45.  One and a half weeks before her

termination, Ms. Villalva claims that Mr. Morales dropped his pants in front of her,

exposing his buttocks.  Docket No. 18-3 at 18-19, pp. 373:22-374:20; *id.* at 21, p.

376:9-11.  Mr. Morales then allegedly instructed her, "Don't Look.  Look at the – just

keep stocking and – and don't go anywhere."  Docket No. 18-5 at 7, p. 492:22-25.[4]  Ms.

Villalva claims that she reported the incident to Store Manager Brian O'Malley.  Docket

No. 18-5 at 9, p. 497:16-20.  In his affidavit, store manager Brian O'Malley denies

having a conversation with Ms. Villalva about Mr. Morales' pants falling down and

further stated that Ms. Villalva "never made a complaint to me about mistreatment by

her coworkers."  Docket No. 18-7 at 3, ¶¶ 12, 16.

    Roughly six weeks before her termination, Ms. Villalva claims that co-worker

Tom Chacon approached her and said, several times, "I want to fuck you."  Docket No.

18 at 9, ¶¶ 61-62.  Ms. Villalva also claims that, on one occasion, a co-worker named

"Darrick"[5] said "I want to fuck you" four times.  *Id.*  Ms. Villalva did not report either of

the incidents.  *Id.*  Roughly three weeks before she was terminated, Ms. Villalva claims

that foreman Gary Daniels called her a "fucking bitch" four to five times and once

threatened to punch her in the face.  *Id.* at 8, ¶ 52; *see* Docket No. 18-2 at 17-19.  Ms.

---

    [4]In a signed, handwritten note submitted to store managers as part of an internal
investigation, Mr. Morales states: "At no time during my time on night crew at King
Soopers #50 did I ever expose myself or remove my pants."  Docket No. 18-22 at 11.

    [5]Ms. Villalva does not recall her co-worker Darrick's last name.

Villalva did not report this incident to any managers.  Docket No. 18 at 8, ¶ 53.  In April 2010, Ms. Villalva claims that co-worker Patrick McCurdy called her a "satan worshiper" and threatened, "I'm going to kick your ass."  *Id.* at 8, ¶ 50.  Ms. Villalva did not report this incident to any managers.  *Id.* at 8, ¶ 51.  One or two weeks prior to her termination, Ms. Villalva claims that co-worker Eddie Aguilera threw pieces of dry dog food at her and called her a "fucking dog" and an "[u]gly, fat, dog."  *Id.* at 8, ¶ 54.  Ms. Villalva did not report this incident to any managers.  *Id.* at 8, ¶ 55.

The events that occurred during the night shift starting on the evening of April 9, 2010 and continuing into the next morning are in dispute.  Ms. Villalva and co-workers Mr. Camargo, Mr. McCurdy, and Mr. Morales were all involved in restocking the store.  At some point, while working in the same general area, Mr. Morales asked Ms. Villalva if he could use a U-boat situated near Ms. Villalva.  Docket No. 18-2 at 23, p. 267:6-12.  In her deposition, Ms. Villalva testified that she calmly denied his request and, when Mr. Morales persisted, moved the U-boat in Mr. Morales' general direction.  *Id.* at 25, p. 269:3-12.  She acknowledged, however, that it was possible she called her co-workers "bastards" at that point.  *Id.* at 27-28, pp. 272:22-273:5.  In a written statement to store management, Ms. Villalva stated that she pushed the U-boat with three fingers, was trying to be gentle, and accidentally tapped Mr. Camargo on the elbow.  Docket No. 18-22 at 13.  During a grievance meeting with Mr. O'Malley, Ms. Villalva stated that her co-workers "were blocking me and I didn't hit [Mr. Camargo] hard enough to do any harm."  Docket No. 18-25 at 1.  In her affidavit submitted with her response brief, Ms. Villalva denies violently pushing a U-boat into a co-worker and denies raising her voice or

calling co-workers "bastards."  Docket No. 25 at 2, ¶¶ 6-10.

Defendant characterizes the interaction between Ms. Villalva and Mr. Morales as a disagreement and asserts that Ms. Villalva intentionally pushed the U-boat down the aisle, causing it to strike Mr. Camargo in the chin.  Docket No. 18 at 3, ¶¶ 13-14. Defendant then claims Ms. Villalva called her co-workers "bastards."  *Id.*  As part of a store investigation, employees on the night shift submitted written statements detailing what they saw and heard.  Docket No. 18-21 at 2, ¶¶ 9-10.  Mr. Camargo submitted a statement indicating that Ms. Villalva called him a bastard and that "Patty then pushed the U-Boat which then hit me in the chin."  Docket No. 18-22 at 2.  Mr. McCurdy, also in the aisle at the time, stated that Ms. Villalva pushed the U-boat causing it to strike Mr. Camargo in the chin and that while she was pushing it, she was calling the three co-workers bastards.  *Id.* at 5.  Mr. Morales makes similar statements.  *Id.* at 10.  Store management completed an Associate Incident In-Store Investigation Report concerning Mr. Camargo's injury.  Docket No. 18-19.

Later, at approximately 5:15 a.m. that morning and while in the store's baby food aisle, Ms. Villalva had a second disputed interaction with her co-workers.  Docket No. 18 at 4, ¶ 20.  Mr. McCurdy indicates that Ms. Villalva came into the aisle and stated that someone had moved her U-boats in the back of the store.  Docket No. 18-22 at 5. Ms. Villalva and Mr. Morales began to argue.  *Id.*  Although Ms. Villalva disputes that she was yelling, co-workers Amy Jones and Lisa Stanley were working in other parts of the store and could hear Ms. Villalva yelling and screaming at Mr. Morales and Mr. McCurdy.  Docket No. 36 at 7, ¶ 11.  Employees observed customers reacting to the outburst.  Docket No. 18 at 5, ¶ 24.  Eventually, Mr. Morales told Ms. Villalva he would

6

not discuss the matter further and ordered Ms. Villalva to clock out and go home. Docket No. 18-22 at 5; Docket No. 18-2 at 31, p. 287:16-24.  Ms. Villalva allegedly responded "hell no" and refused the order.  Docket No. 18-22 at 12.  Ms. Villalva claims she did not say "hell no," but admits that eventually she, Mr. Morales, and Grocery Manager Jason Wade went to the back to the store to discuss the situation.  Docket No. 18 at 5, ¶ 26.  Ms. Villalva refused to lower her voice.  Docket No. 27 at 3, ¶ 27.  Mr. Wade stated that he reiterated the order to clock out twice before Ms. Villalva eventually complied.  Docket No. 18-22 at 15.

On April 11, 2010, Mr. O'Malley and Ms. McNerney conducted an investigation into Ms. Villalva's behavior.  Docket No. 18 at 5, ¶ 31.  Ms. McNerney interviewed night shift workers present on April 10, 2010 and additionally asked each to submit written statements.  Docket No. 18-7 at 2, ¶ 7.  Based on the investigation, Mr. O'Malley determined that Ms. Villalva "had intentionally pushed a U-boat into Mr. Camargo, that she screamed and yelled . . . during an outburst on the sales floor," that she disobeyed Mr. Morales' orders to punch out, and that Mr. Wade "had to tell her twice to clock out and leave."  *Id.* at 2, ¶ 9.  In Mr. O'Malley's judgment, Ms. Villalva's behavior constituted gross misconduct in violation of the Policy Manual's Threats & Violence and Misconduct sections.  *Id.* at 2, ¶ 10.  On April 21, 2010, Mr. O'Malley terminated Ms. Villalva and issued a termination form, where he checked boxes indicating that Ms. Villalva was discharged for "violation of policies/procedures", "violation of safety policy," "caus[ing] bodily harm to another employee," and "gross misconduct."  Docket No. 18-9.  The form further states, "On 4/10/10, Patty lost her temper on the sale[s]floor, disrupted business, and caused an employee injury."  *Id.*  Ms. Villalva disputes that her termination was

based on an investigation and argues that Mr. O'Malley's stated reasons for her termination are mere pretext.  Docket No. 27 at 2, ¶ 12.

After her termination, Ms. Villalva contacted Manager Labor/Employee relations Stephanie Bouknight and alleged that she had been sexually harassed during her employment.  Docket No. 18 at 9, ¶ 66.  Ms. Bouknight determined that Ms. Villalva had not complained of sexual harassment while employed by defendant.  Docket No. 18-18 at 2, ¶ 5.  The Union filed a grievance challenging Ms. Villalva's termination, but later dropped it because the conduct forming the basis of the termination was "corroborated by employees' statements."  Docket No. 18-26; Docket No. 18-27.  On June 13, 2010, Ms. Villalva filed an Equal Employment Opportunity Commission Charge where she alleged discrimination based on sex.  The charge briefly described the incidents with Mr. Morales and Mr. Camargo as well as the April 10, 2010 incident.  Docket No. 18-28. Ms. Villalva did not check the box on the Charge of Discrimination form indicating that her charge was based in part on retaliation and did not amend the charge.  Docket No. 18 at 10, ¶ 69.  On April 30, 2012, the Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights on Ms. Villalva's charge.  Docket No. 18-29.

On July 31, 2012, Ms. Villalva filed this action.  Docket No. 1 at 1.  Ms. Villalva brings claims under Title VII of the Civil Rights Act of 1964 for disparate treatment, sex discrimination, and retaliation along with state-law claims for negligent supervision, negligent retention, wrongful discharge in violation of public policy, and intentional infliction of emotional stress.  *Id.* at 5-7.  Defendant moves for summary judgment on all claims.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998)) (internal quotation marks omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead

must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)). "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

## III.  ANALYSIS

Ms. Villalva claims that defendant violated Title VII of the Civil Rights Act of 1964 by improperly discharging her based on gender, subjecting her to a hostile work environment, and terminating her in retaliation for her complaints regarding her work environment.  Docket No. 36 at 2-3.  Under Title VII it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

### A.  Discriminatory Discharge

Ms. Villalva does not advance any direct evidence that she was fired because of her gender.  Therefore, where there is no direct evidence of discrimination, plaintiff must rely on the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973), to show defendant's discriminatory animus.  *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (a plaintiff can prove discrimination "by

relying on the three-part *McDonnell Douglas* framework") (internal quotation marks omitted).  Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *Id.*  In order to make a prima facie case of disparate treatment, plaintiff must show three elements: (1) that she belonged to a protected class; (2) that she suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011).[6]  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant employer to state a legitimate, nondiscriminatory reason for its adverse employment action.  *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1321 (10th Cir. 2004).  If the defendant produces a legitimate reason, then the court must grant defendant summary judgment unless the plaintiff can show a genuine issue of material fact as to whether the stated reason for the adverse action is pretextual.  *Id.*

Turning first to Ms. Villalva's prima facie case, defendant does not dispute the existence of the first two elements, but argues that Ms. Villalva has not shown that her

---

[6]The Tenth Circuit has noted that the prima facie case is sometimes articulated differently depending on the specific claim before the court.  *See id.* at 1095 n.1; *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1307 (10th Cir. 2005).  In discriminatory termination cases, the prima facie case is often broken into four elements.  *See, e.g., Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1150 (10th Cir. 2008) ("Generally stated, a prima facie case of discriminatory discharge under Title VII requires plaintiff to demonstrate that she (1) belongs to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge.").  No matter the precise formulation, "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'"  *Id.* at 1151 (quoting *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005).

termination was under circumstances giving rise to an inference of discrimination. Docket No. 18 at 13.  However, at this juncture, plaintiff's burden is light.  *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1171 (10th Cir. 2007) ("only the most baseless of [Title VII] claims fails to satisfy" the prima facie burden).  To establish the third element, plaintiff can present evidence of "preferential treatment given to employees outside the protected class," "actions or remarks made by [a] decisionmaker," or circumstances related to "the timing or sequence of events leading to plaintiff's termination."  *Plotke v. White*, 405 F.3d 1092, 1100-01 (10th Cir. 2005) (citation and quotation omitted).  The real question is "whether a plaintiff has shown actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion."  *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002) (internal quotation and citation omitted).  "Regardless of whether [courts] analyze the plaintiff's evidence in reference to the prima facie case or the business justification versus pretext inquiry, . . . if the court correctly concludes that the evidence of discrimination/pretext fails as a matter of law, summary judgment for the defendant is the proper result."  *E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 800 n.5 (10th Cir. 2007) (internal citations and quotations omitted).

For the purposes of summary judgment, the Court will assume, without deciding, that Ms. Villalva has met her relatively light burden of establishing the prima facie case and will analyze the circumstances surrounding her termination as evidence of pretext. *See id.*; *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 n. 5 (10th Cir. 2005) (noting that some Tenth Circuit cases treat circumstances suggestive of discrimination as an

element of a prima facie case; other cases treat these circumstances as part of the subsequent inquiry into pretext).

Defendant asserts that it terminated Ms. Villalva for running a U-boat into Mr. Camargo and for outbursts directed toward Mr. Camargo, Mr. Morales, and Mr. McCurdy on April 10, 2010.  Docket No. 18 at 3, ¶ 12.  In Mr. O'Malley's judgment, Ms. Villalva's behavior constituted gross misconduct in violation of the Policy Manual's Threats & Violence and Misconduct sections.  Docket No. 18-7 at 2, ¶ 10.  On April 21, 2010, Mr. O'Malley completed a termination form, indicating that Ms. Villalva was terminated for "violation of policies/procedures," "violation of safety policy," "caus[ing] bodily harm to another employee," and "gross misconduct."  Docket No. 18-9.  The Court finds that defendant's stated reasons for the termination are legitimate, nondiscriminatory reasons. *See Zamora*, 478 F.3d at 1165-66 (noting burden on employer to show legitimate, nondiscriminatory reason is "exceedingly light").

To show pretext, Ms. Villalva must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for" its termination decision.  *See Crowe v. ADT Security Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011).[7]  The Court's role is to prevent and redress employment discrimination, and not to act as a "'super personnel department,'

---

[7]Ms. Villalva incorrectly argues that she does not have to show pretext at the summary judgment stage.  Citing *Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373 (10th Cir. 1994), Ms. Villalva argues that establishing the elements of retaliation is sufficient to survive summary judgment on a discriminatory discharge claim.  Docket No. 27 at 11-12.  In *Cole*, the Tenth Circuit reversed summary judgment on a Title VII discrimination claim after *finding* sufficient evidence of pretext.  43 F.3d at 1381.  Thus, Ms. Villalva misinterprets *Cole* and the Court rejects her argument.

second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2004).

Ms. Villalva relies almost exclusively on the circumstances occurring in the months leading up to her termination. Docket No. 27 at 9. Specifically, Ms. Villalva argues that Mr. Camargo's alleged physical attack, the comments made by Mr. Daniels, the incident where Mr. Aguilera allegedly made vulgar comments and threw dog food, the alleged exposure of Mr. Morales' buttocks, and Ms. Villalva's report of harassment to Ms. McNerney give rise to an inference of discrimination. *Id.* However, these incidents do not support a finding of pretext. It is undisputed that Mr. Camargo, Mr. Daniels, Mr. Aguilera, and Mr. Morales did not have the ability to hire, promote, or discharge Ms. Villalva. Docket No. 18-18 at 2, ¶ 7. Although Ms. McNerney may have had the ability to discharge Ms. Villalva, Ms. Villalva's report of harassment consisted only of a complaint that Mr. Morales "told [Ms. Villalva] what to do" and "didn't treat the men the same way." Docket No. 18-21 at 1-2, ¶ 4; Docket No. 25 at 2, ¶ 14. The Court does not find weaknesses or implausibility in defendant's stated reason for termination on the basis claimed by Ms. Villalva.

Ms. Villalva indicates that discrimination should be inferred because she was the only woman on her crew. Docket No. 27 at 10. This fact alone does not create an inference that she was discharged on the basis of gender. *See Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1147 (10th Cir. 2009) ("statistic regarding the gender imbalance . . . does not, without additional evidence, suggest . . . discrimination.");

*Diettrich v. Northwest Airlines, Inc.*, 168 F.3d 961, 966 (7th Cir. 1999) (holding sample size of twelve did not permit inference that employer discriminated on the basis of age).

Ms. Villalva argues that an inference of unlawful discrimination exists because she reported discriminatory incidents to Ms. McNerney and Mr. O'Malley and both managers also conducted an investigation into the incident that led to her termination. Docket No. 27 at 10.[8]  However, there is no indication that gender played a role in the investigation, nor that the managers were influenced in any way by Ms. Villalva's alleged reports.  Ms. Villalva's report of harassment to Ms. McNerney only vaguely referred to gender and referenced no specific incidents of gender-based harassment. The record does not support an inference that Mr. O'Malley in any way considered Ms. Villalva's alleged report of the exposure incident in his decision to terminate Ms. Villalva.  *See* Docket No. 18-7 at 2.  Thus, the Court cannot infer weakness or implausibility in defendant's stated reasons on that basis.

Ms. Villalva suggests that the investigation into Mr. Camargo's injury was tainted because managers relied on statements from the same co-workers who allegedly sexually harassed Ms. Villalva.  This is insufficient to show pretext for several reasons. First, even if the investigation into the U-boat incident was somehow tainted, Ms. Villalva's alleged injury of Mr. Camargo was not the only incident that led to her termination.  The stated reasons for Ms. Villalva's termination also included (a) gross misconduct and a violation of policy, based on Ms. Villalva's subsequent outburst,

---

[8]For the purposes of summary judgment, the Court assumes that Ms. Villalva reported the alleged exposure incident to Mr. O'Malley, even in light of strong evidence that no such report took place.

heard by co-workers and customers, and (b) insubordination, witnessed by Mr. Wade. Docket No. 18-7 at 2, ¶¶ 9, 10; Docket No. 18-9.   Other than her own subjective belief, Ms. Villalva points to nothing in the record to call those additional reasons into doubt. *See Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996) (noting that a plaintiff's subjective belief is insufficient to show pretext).   Moreover, Ms. Villalva does not argue that the policies advanced as the basis for her termination were applied in a discriminatory manner.[9]   Second, in addition to Mr. Camargo and Mr. Morales, Mr. McCurdy was also a witness to the U-boat incident and has not been accused of any gender-based misconduct towards Ms. Villalva.[10]   Moreover, the investigation into Ms. Villalva's subsequent outburst also included statements from co-workers and managers unconnected with discrimination allegations, including employees Tina DaVita, Ms. Jones, Ms. Stanley, and Mr. Wade.   Docket No. 18-7 at 2, ¶ 7.   Finally, it is not the factual accuracy of the stated reasons for termination, but whether the terminating manager "reasonably 'perceived' that [the reasons were] accurate."   *Tesh v. U.S. Postal Serv.*, 349 F.3d 1270, 1273 (10th Cir. 2003) ("we must assess pretext by examining the facts as they appear to the person making the decision to terminate").   The evidence Ms. Villalva produces in support of her pretext argument does not indicate that Mr.

---

[9]Ms. Villalva does not argue that any other employees are similarly situated such that they would be suitable comparators.  *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standard governing performance evaluation and discipline." (internal quotations and citations omitted)).

[10]Although Ms. Villalva alleges that Mr. McCurdy at one point said "I'm going to kick your ass" and called her a "satan worshiper," these comments, without more, do not implicate Ms. Villalva's gender and do not evince gender-based animus on the part of Mr. McCurdy.  *See* Docket No. 18 at 8, ¶ 50.

O'Malley reasonably perceived an inaccuracy in the stated reasons for Ms. Villalva's termination.  Thus, regardless of whether analyzed by reference to the prima facie case or the pretext inquiry, Ms. Villalva's "evidence of discrimination/pretext fails as a matter of law." *Sorbo*, 432 F.3d at 1174.  Thus, the Court will grant defendant's motion for summary judgment on Ms. Villalva's claim for discriminatory discharge.

### B.  Hostile Work Environment

Defendant argues that Ms. Villalva cannot meet the elements of a hostile work environment claim and that it is not liable for any alleged incidents of sexual harassment.  Docket No. 18 at 14-15.  Sexual harassment that is sufficiently serious qualifies as unlawful sex discrimination under Title VII.  *Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 67 (1986).  Ms. Villalva can establish a claim of a hostile work environment based on unlawful sex discrimination by showing (1) that she was discriminated against because of her sex, and (2) that the discrimination was sufficiently severe or pervasive so as to alter her conditions of employment.  *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012).  To establish a hostile work environment claim, Ms. Villalva must show that the environment was both "objectively and subjectively hostile or abusive."  *Id*. (citation omitted).  Ms. Villalva must also show that defendant is liable for any unlawful incidents of sexual harassment.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  It is on the issue of liability that Ms. Villalva's claim fails as a matter of law.

Defendant argues that the conduct of which Ms. Villalva complains was not based on gender.  Docket No. 18 at 15.  As an initial matter, Ms. Villalva does not

specifically identify incidents that evidence sexual harassment as is required on summary judgment. *See Celotex,* 477 U.S. at 324*; Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012) (to state a prima facie case, plaintiff must show that she was "targeted for harassment" because of her sex). Instead, Ms. Villalva refers to defendant's brief and claims, without citation to the record, that three to five gender-based incidents have been established. Docket No. 27 at 13. Defendant's brief mentions the following alleged incidents: At some point during her employment, Mr. Morales told a dirty joke in Ms. Villalva's presence about a man and a woman having sex. Docket No. 18-6 at 3, p. 536:1-21. Six weeks before Ms. Villalva was terminated, co-worker Tom Chacon approached Ms. Villalva and said, several times, "I want to fuck you." Docket No. 18 at 9, ¶¶ 61-62. A week later a co-worker named Darrick said "I want to fuck you" four times. *Id.*; Docket No. 18-6 at 7, p. 551:6-22. Three weeks before Ms. Villalva was terminated, foreman Gary Daniels called Ms. Villalva a "fucking bitch" four to five times and threatened to punch her in the face. Docket No. 18 at 8, ¶ 52; *see* Docket No. 18-2 at 17-19. One or two weeks before Ms. Villalva was terminated, co-worker Eddie Aguilera threw pieces of dry dog food at her and called her a "fucking dog" and an "[u]gly, fat, dog." Docket No. 18 at 8, ¶ 54. A week and a half prior to Ms. Villalva's termination, Mr. Morales dropped his pants in front of Ms. Villalva and exposed his buttocks. Docket No. 18-3 at 18-19, pp. 373:22-374:20, *id.* at 21, p. 376:9-11.

Although Ms. Villalva recalls few details about Mr. Morales' alleged "dirty joke," Ms. Villalva indicates that she found the description of "foreplay" and "sex" "very offensive," which is sufficient for a reasonable juror to find that the incident was gender-

18

based.  Docket No. 18-6 at 3, p. 536:1-21.  The comments made by Mr. Chacon and Darrick, taking the form of unwanted sexual advances, appear undoubtedly gender-based.  However, the remaining alleged incidents do not necessarily compel the same conclusion.  The term "fucking bitch," especially when combined with a physical threat, is certainly offensive, but it is not entirely clear from Ms. Villalva's description of events that it was made because of sex; rather, Ms. Villalva indicates that she and Mr. Daniels disagreed over the speed at which a fellow co-worker was stocking shelves.  *See* Docket No. 18-2 at 17, p. 252:3-19; *id.* at 20, p. 258:3-18.  Being called an "[u]gly, fat, dog" and having dry dog food thrown in one's direction is certainly offensive and humiliating, but, by Ms. Villalva's admission, it is not clear that the incident was motivated by gender animus.  Docket No. 18-2 at 22, p. 263:2-12 ("I don't know why Mr. Aguilera would do it or who prompted him or if he prompted himself."); *see Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (holding that plaintiff must prove harassment was because of gender).  Similarly, it is not entirely clear from Ms. Villalva's description whether Mr. Morales' alleged exposure of his buttocks was directed towards her or whether she happened upon him when his pants had fallen down.  Docket No. 18-3 at 18-19, pp. 373:22-374:20; *id.* at 21, p. 376:9-11.

Even assuming Ms. Villalva could establish that all five of the above-mentioned incidents are gender-based, Ms. Villalva must meet her burden of showing that the incidents were sufficiently severe or pervasive in relation to her personal work environment.  *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1139 (10th Cir. 2008).  To establish that her workplace was hostile, Ms. Villalva must provide evidence showing

that the workplace was "permeated with discriminatory intimidation, ridicule, and insult,

that [was] sufficiently severe or pervasive to alter the conditions of [her] employment

and create an abusive working environment." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d

675, 680 (10th Cir. 2007).  Severity and pervasiveness, while independent and equal

grounds, are inversely related to a certain degree; "'a sufficiently severe episode may

occur as rarely as once . . . , while a relentless pattern of lesser harassment that

extends over a long period of time also violates the statute.'" *Tademy*, 614 F.3d at 1144

(quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)).  Severity

and pervasiveness are evaluated according to the totality of the circumstances,

considering such factors as "the frequency of the conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." *Harsco Corp. v.

Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007) (listing factors to be considered in

determining whether environment is hostile or abusive).

Turning first to the objective component, no single incident is sufficiently severe

to, by itself, alter the conditions of Ms. Villalva's employment.  Ms. Villalva recalls so

little about Mr. Morales' alleged "dirty joke" that the Court cannot find that it significantly

affected Ms. Villalva's work environment.  Docket No. 18-6 at 3, p. 536:1-21.  The

alleged unwanted sexual advances are troubling, but the record does not indicate that

Mr. Chacon or Darrick were Ms. Villalva's supervisors, or that the comments were

coupled with any physical threat. *But see Davis*, 142 F.3d at 1341 ("unwelcome

hugging and kissing combined with . . . an assault . . . is objectively hostile").  The term

"fucking bitch," especially when combined with a physical threat, is certainly offensive, but it is not severe enough to ground a claim in the face of indications that the incident was not motivated by gender. Being called an "ugly, fat, dog" and having dog food thrown is humiliating, but, based on Ms. Villalva's description, the incident is not so clearly gender-based or severe as to ground a claim. *See Bertsch*, 684 F.3d at 1028 ("A line must be drawn between actionable conduct and conduct that is merely insensitive, tasteless, or vulgar. Title VII's mandate is not to ensure workplace harmony or create a finishing school."). Similarly, it is not clear from Ms. Villalva's description that the alleged exposure of Mr. Morales' buttocks was sexual in nature or was motivated by gender such that it objectively altered her conditions of employment. Docket No. 18-3 at 18-19, pp. 373:22-374:20, *id.* at 21, p. 376:9-11.[11]

Neither are the incidents, when considered together, sufficiently pervasive so as to create an objectively abusive environment. Ms. Villalva, without referring to specific incidents, argues that the alleged conduct was severe and pervasive because it occurred in the period immediately preceding her termination. Docket No. 27 at 14. The Court disagrees for multiple reasons. First, although some of the alleged incidents occurred relatively close in time, frequency is but one factor. Although there is no numerical threshold, the five incidents, given their respective severity, "fall far short of

---

[11]Although Ms. Villalva does not specifically point to any other incidents, as it is her burden to do, the record indicates that, while in Ms. Villalva's presence, Mr. Camargo allegedly stated to a customer that the back end of the store was no place for women and, on a separate occasion, said "let a man do his work." Docket No. 18 at 9, ¶¶ 63, 65. Ms. Villalva claims Mr. Camargo also told her that he did not get along with females and banged on her car windows. *Id.* at 7, ¶ 49. These alleged incidents, even if properly raised, do not transform Ms. Villalva's employment conditions into an objectively hostile work environment.

the 'steady barrage' required for a hostile environment claim."  *See Chavez*, 397 F.3d at

832.  Second, other than the temporal connection between the alleged incidents,  Ms.

Villalva does not argue that the alleged incidents were somehow related.  *See Morris*,

666 F.3d at 666 (holding that plaintiff cannot base a hostile work environment case "'by

demonstrating a few isolated incidents of . . . sporadic . . . slurs . . . .'" (quoting *Chavez*,

397 F.3d at 832)).[12]

       Moreover, although the burden is not an onerous one, Ms. Villalva does not

address the subjective component of the test other than to state "I had been getting

severely harassed . . . ."  Docket No. 25 at 2, ¶ 11; *see Davis v. U.S. Postal Serv.*, 142

F.3d 1334, 1341 (10th Cir. 1998) (holding that plaintiff's statements concerning her

work environment were sufficient to meet the subjective component).  The subjective

component does not require a plaintiff to show serious effects on her psychological

well-being or tangible impairment of work performance.  *Id.*  However, Ms. Villalva does

not indicate that the incidents in any way interfered with her work performance or

subjectively altered the terms and conditions of her employment.  *See generally* Docket

No. 25; *Morris*, 666 F.3d at 664.

       Even if a reasonable juror could find that Ms. Villalva has sufficiently established

a prima facie case of sexual harassment, Ms. Villalva's claims fail entirely as a matter of

---

[12]Although Ms. Villalva does not specifically argue this point, "[f]acially neutral
abusive conduct can support a finding of gender animus sufficient to sustain a hostile
work environment claim when the conduct is viewed in the context of other, overtly
gender-discriminatory conduct."  *Chavez*, 397 F.3d at 833 (quoting *O'Shea v. Yellow
Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999).  In a review of the record, the
Court finds that, even when considered in the context of other incidents, none of the
gender-neutral incidents of alleged harassment compel a finding that Ms. Villalva's work
environment was objectively hostile.

law on the issue of liability.  The Supreme Court has ruled that employers are not automatically liable for sexual harassment perpetrated by their employees.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  The Court, however, held that employers may be liable for the conduct of their employees under two theories: (1) negligence and (2) vicarious liability. *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir. 2011).  Ms. Villalva appears to indicate that her claim involves both non-supervisory and supervisory co-workers.  Docket No. 27 at 14-15.  Therefore, the Court will address both theories of liability.

Under the negligence theory, an employer is liable only "if it knew or should have known" about the sexually harassing conduct of a non-supervisory employee and failed to stop it.  *Ellerth*, 524 U.S. at 759; *Bertsch*, 684 F.3d at 1027.  To prove this theory of liability, Ms. Villalva must establish that (1) the employer had actual knowledge or constructive knowledge of the harassment and (2) the employer's remedial and preventative responses to the harassment were inadequate.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998).  Actual knowledge is demonstrable when the "plaintiff has reported harassment to management-level employees," while constructive knowledge assumes that "highly pervasive harassment should, in the exercise of reasonable care, be discovered by management-level employees."  *Id.*

Ms. Villalva argues that her reports of harassment to Ms. McNerney and Mr. O'Malley are sufficient to establish actual knowledge.  Docket No. 27 at 14.  The Court disagrees.  As stated above, the fact that Ms. Villalva vaguely indicated that Mr. Morales always told Ms. Villalva what to do and did not treat men the same way did not

provide Ms. McNerney actual or constructive knowledge of any of the specific gender-based incidents of harassment Ms. Villalva relies upon.  Docket No. 27 at 13.[13]  Ms. Villalva's report to Mr. O'Malley concerning Mr. Morales' alleged exposure gave defendant actual knowledge of this incident, but Ms. Villalva has not produced any evidence indicating that defendant's response to her report was inadequate and, to the contrary, there is an indication that Mr. Morales apologized to her.  *See* Docket No. 18-4 at 2, p. 391:4-14.  Turning to the unreported incidents, Ms. Villalva has not referenced specific facts evidencing defendant's constructive knowledge of the unreported incidents, and the Court does not find the unreported incidents are sufficiently pervasive such that they should have reasonably been discovered by management-level employees.  *See Baker v. Weyerhaeuser Co.*, 903 F.2d 1342, 1346 (10th Cir. 1990) ("it is only when [the incidents of harassment] are so egregious, numerous, and concentrated as to add up to a campaign of harassment that the employer will be culpable for failure to discover what is going on" (quoting *Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1422 (7th Cir. 1986)).  Thus, the Court finds that Ms. Villalva has failed to show that defendant had actual or constructive knowledge of sufficient sexual harassment incidents to sustain a claim.

Ms. Villalva also appears to argue that defendant is vicariously liable because Mr. Morales was a supervisor.  Docket No. 27 at 15.  The Court assumes, without

---

[13]Ms. Villalva also indicates that she reported Mr. Camargo striking her four times in one shift.  Docket No. 18 at 6, ¶ 40; Docket No. 18-2 at 5, p. 232:5-9.  However, there is no indication that this incident was gender based, especially where Ms. Villalva admits that Mr. Camargo fought both men and women at work.  Docket No. 18 at 7, ¶ 46.  Accordingly, the Court will not infer actual or constructive knowledge on the basis of Ms. Villalva's report of this incident.

deciding, that Mr. Morales is a supervisor for the purposes of imposing vicarious liability. *See Faragher*, 524 U.S. at 807 (defining supervisor as one with "immediate (or successively higher) authority over the employee").[14]  An employer may be vicariously liable for the acts of a supervisor in two situations.  First, an employer may be liable if a supervisor's sexually harassing conduct culminates in a tangible adverse employment action for the employee.  *Id*.  Second, in the absence of a direct tangible adverse employment action, the employer is liable for a severe and pervasive hostile work environment unless it can prove the *Faragher/Ellerth* defense by a preponderance of the evidence.  *Helm*, 656 F.3d at 1285.[15]

Mr. Morales' actions, as analyzed above, are insufficiently severe or pervasive to sustain a hostile work environment claim.  Accordingly, the Court finds that, regardless of whether defendant is vicariously liable for Mr. Morales' alleged actions, Mr. Morales' alleged actions are insufficient to show the existence of an actionable hostile work environment.  Thus, the Court will grant defendant's motion for summary judgment on Ms. Villalva's hostile work environment claim.

---

[14]Although Ms. Villalva does not argue that defendant is vicariously liable for the comments made by foreman Gary Daniels, such a claim would fail because, as stated above, Mr. Daniels' comments were not so clearly motivated by gender animus as to sufficiently alter Ms. Villalva's working environment.

[15]In order to show that her supervisor's actions culminated in her termination, Ms. Villalva must "establish a strong causal nexus between the supervisor's harassment and the tangible employment action." *Helm*, 656 F.3d at 1287.  It is undisputed that Mr. Morales did not have the authority to terminate Ms. Villalva.  Docket No. 18-18 at 2, ¶ 7.  Mr. Morales did not conduct the investigation that ultimately led to Ms. Villalva's termination.  Docket No. 18 at 5, ¶ 31.  Moreover, Mr. Morales was only one of several sources that store managers relied upon during their investigation.  *See* Docket No. 18-22.  The Court finds that Ms. Villalva has failed to show that Mr. Morales' actions culminated in her termination.

### C.  Retaliation

Defendant argues that Ms. Villalva failed to exhaust administrative remedies with respect to her retaliation claim.  Docket No. 18 at 11.  A Title VII plaintiff must exhaust her administrative remedies for each alleged individual discriminatory act.  *Apsley v. Boeing Co.,* 691 F.3d 1184, 1210 (10th Cir. 2012); *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1325 (10th Cir. 2002).  "In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to suit."  *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007).  To determine whether a plaintiff has exhausted her administrative remedies, courts identify the scope of the allegations raised in a plaintiff's charge of discrimination because a "plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination."  *Id.* at 1186; *see also MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005).  Courts liberally construe charges of discrimination in determining whether a plaintiff exhausted administrative remedies of a particular claim.  *Jones*, 502 F.3d at 1186.

Generally, a charge of discrimination form contains boxes for a charging party to check as the basis for his or her claim of discrimination.[16]  By checking the appropriate box, a charging party can assert a claim for discrimination based on race, retaliation, color, age, sex, disability, religion, genetic information, or national origin.  *See* Docket No. 18-28.  The failure to mark a particular box on a charge of discrimination creates a presumption that the charging party is not asserting claims represented by that box.

---

[16]A charging party can also describe the factual allegations of his or her charge by writing in the space available underneath the boxes.  *See, e.g.,* Docket No. 18-28.

*Jones*, 502 F.3d at 1186.  The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim.  *Id*.  In this case, it is undisputed that Ms. Villalva failed to mark the "retaliation" box in her charge of discrimination.  *See* Docket No. 18-28.  The relevant inquiry then is whether the EEOC could reasonably have investigated a retaliation claim based on the narrative portion of Ms. Villalva's charge of discrimination.  *Jones*, 502 F.3d at 1186-87.

> Ms. Villalva's EEOC charge states, in relevant part:
>
> The night crew foreman (male) exposed himself to me and another male employee got physical with me three times.  I reported this to management but no action was taken.  The harassment continued and worsened and I was called names, had dog food thrown down my aisle, and was screamed at, etc.
>
> In the end, some of the male employees made false accusations against me and told management that I caused bodily harm to a male employee.  I was terminated.

Docket No. 18-28.  Ms. Villalva clearly indicates that she reported her co-workers' conduct to management – an action that could be considered a protected activity – and, although not explicitly stated, a temporal connection between those reports and her termination is easily inferred.  *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008) (identifying the factors necessary to state a prima facie case of retaliation).  Therefore, construed liberally, Ms. Villalva's charge could be read as alleging that her termination was, in some measure, retaliation for her report of alleged harassment.  When read in this light, an investigation reasonably could have followed from Ms. Villalva's charge as to whether her termination was retaliatory.  *See* 29 C.F.R. § 1601.12(b) ("a charge is sufficient when the Commission receives from the person

making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of"). Accordingly, the Court finds that Ms. Villalva's charge of discrimination rebuts the presumption established by her failure to check the retaliation box such that Ms. Villalva exhausted administrative remedies for her claim of retaliation.[17]

Title VII prohibits retaliation against individuals who oppose discriminatory employment practices in complaints or investigations of employment practices prohibited by Title VII. *See* 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must prove three elements: "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action." *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1264-65 (10th Cir. 2007). If plaintiff can establish a prima facie case, defendant must then articulate a legitimate, nondiscriminatory or non-retaliatory reason to support its employment decision. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006). At that point, the burden shifts back to plaintiff to demonstrate that the defendant's legitimate reason is pretext. *Id.*

"Protected opposition can range from filing formal charges to voicing informal complaint to superiors." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir.

---

[17]Both parties rely on *Robinson v. Bd. of Regents of Univ. of Colo.*, 390 F. Supp. 2d 1011 (D. Colo. 2005). In *Robinson*, the plaintiff failed to check the "retaliation" box in both formal charges. *Id.* at 1019. However, in a review of plaintiff's narrative, the court found nothing indicating that plaintiff intended to raise a retaliation claim. *Id.* In the instant case, Ms. Villalva indicated that she engaged in a protected activity; thus, *Robinson* does not aid in the Court's analysis.

2004).  "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [anti-discrimination statutes]."  *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  Ms. Villalva need only show that, "when [she] engaged in protected opposition, [she] had a reasonable good-faith belief that the opposed behavior was discriminatory."  *Hertz*, 370 F.3d at 1016. Additionally, a causal connection "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  *See Conner v. Schnuck Markets*, *Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997).   Temporal proximity can be "sufficient to allow an inference that a causal connection existed between the internal grievance and the decision to terminate [plaintiff]."  *Argo v. Blue Cross & Blue Shield of Kan.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (determining 24 days between complaint and termination sufficient to create inference of causal connection); *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (nothing that a period of six weeks gives rise to a rebuttable inference of a causal connection).

Ms. Villalva claims that she took two protected actions: one, reporting to Ms. McNerney that Mr. Morales was harassing her and, two, reporting to Mr. O'Malley that Mr. Morales exposed his buttocks.  Docket No. 27 at 12.  It is undisputed that Ms. Villalva did not report any of her co-workers' alleged sexual comments preceding her termination.  *See* Docket No. 18 at 8, ¶¶ 53, 55, 56; *id.* at 9, ¶ 62.  Moreover, Ms. Villalva's July 4, 2010 complaint to Manager Labor/Employee Relations Stephanie

Bouknight, *id.* at 9, ¶ 66, occurred well after Ms. Villalva had been terminated and is

irrelevant to establishing the first element of a prima facie case for retaliation.  The

Court finds that the report to Ms. McNerney and the alleged report to Mr. O'Malley are

the only incidents through which Ms. Villalva can establish that she took a protected

action.[18]

As discussed above, Ms. Villalva's report to Ms. McNerney did not refer to

specific gender-based conduct that Ms. Villalva believed was in violation of Title VII.

*See* Docket No. 18 at 7, ¶ 44; Docket No. 27 at 5, ¶ 44; Docket No. 18-21 at 2, ¶ 4;

Docket No. 25 at 2, ¶14.  For that reason, it is difficult to determine the extent of Ms.

Villalva's reasonable belief.  Turning to Ms. Villalva's second alleged protected action,

Ms. Villalva indicated that she reported Mr. Morales' alleged exposure to Mr. O'Malley

and indicated to him that she "wanted to press sexual harassment charges.  I wanted

something done about it . . . I said 'I want him fired.'" Docket No. 18-5 at 10, pp. 498:2-

18.  Ms. Villalva has not produced additional information about the circumstances that

made up her alleged report,[19] and the Court cannot look to Mr. O'Malley's recollection of

---

[18]Ms. Villalva vaguely indicates that, in March 2010, she reported Mr. Camargo for striking her, but there is no indication Ms. Villalva believed Mr. Camargo's behavior to be discriminatory.  Docket No. 18-2 at 5, p. 232:5-9.

[19]Ms. Villalva was asked, at another point in her deposition, if she reported the incident to anyone at King Soopers.  Her answer is less clear:

The next morning – or the – it was 4:30 in the morning.  Mr. O'Malley came in at 7:30.  Mr. Morales spoke to Mr. O'Malley, and he told me – he addressed me passing the aisle that he had dropped his pants on or close to that aisle, that he talked to Mr. O'Malley, and Mr. O'Malley told him to just apologize, and I asked Mr. Morales – I said, "Of course you're apologizing for having your pants down on the aisle?"  And he said, "Yes."  His eyes got really big because he knew he did it, and he – yes, yes, yes.

Docket No. 18-4 at 2, p. 391:4-14.  This description is unhelpful on the issue of Ms.

events where Mr. O'Malley denies that any such report took place.  Docket No. 18-7 at 3, ¶¶ 12-13; Docket No. 18-10 at 2.  However, when viewing the evidence in the light most favorable to Ms. Villalva, a reasonable juror could find that Ms. Villalva's reports to Ms. McNerney and Mr. O'Malley conveyed her reasonable belief that prohibited sexual harassment had taken place.  *See Hertz*, 370 F.3d at 1015-16.

Turning to the second element of a prima facie case, the Court finds that termination is a materially adverse employment action.  As to the third element, Ms. Villalva argues that a causal connection can be inferred because Mr. O'Malley was both the manager who heard Ms. Villalva's report and the manager who investigated and ultimately discharged Ms. Villalva a short time later.  Docket No. 27 at 12.  The Court finds that the proximity between Ms. Villalva's complaints to Ms. McNerney and Mr. O'Malley and the events of April 10, 2010 is sufficient to create an inference that a causal connection exists.  *See Argo*, 452 F.3d at 1202.

The Court now addresses whether the defendant has articulated a legitimate, non-retaliatory reason for its employment decision and, if so, whether Ms. Villalva is able to demonstrate that defendant's reason is pretextual.  As noted above, defendant has met its burden of articulating legitimate, nondiscriminatory reasons for Ms. Villalva's discharge.  *See* Docket No. 18 at 12 n.3.  Ms. Villalva, however, fails to show that defendant's reason was pretextual.  For the above-stated reasons, Ms. Villalva does not demonstrate any implausibilities or contradictions in defendant's stated reasons for discharging Ms. Villalva.  The inference of a causal connection regarding Ms. Villalva's

---

Villalva's reasonable belief because it does not indicate precisely what, if anything, Ms. Villalva communicated to Mr. O'Malley.

report to Ms. McNerney and Mr. O'Malley does not, by itself, demonstrate such implausibilities or contradictions. Accordingly, the Court finds that Ms. Villalva has failed to produce evidence that defendant's stated reasons for her termination were pretext for retaliation. Thus, the Court will grant defendant's motion for summary judgment on Ms. Villalva's retaliation claim.

### D. Tort Claims

Ms. Villalva's claims arising under federal law have been dismissed; therefore, jurisdiction over Ms. Villalva's state-law claims implicates 28 U.S.C. § 1367(c)(3). In the Tenth Circuit, when § 1367(c)(3) is implicated, courts should dismiss pendent state law claims "'absent compelling reasons to the contrary.'" *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (reversing the district court's grant of summary judgment on state law claims); *Endris v. Sheridan Cnty. Police Dep't*, 415 F. App'x 34, 36 (10th Cir. 2011) ("any state-law claims for assault and battery or mental and emotional injury were inappropriate subjects for the exercise of pendent jurisdiction where all federal claims had been dismissed"). *But see Henderson v. Nat'l R.R. Passenger Corp.*, 412 F. App'x 74, 79 (10th Cir. 2011) (finding no abuse of discretion in trial court's decision to retain jurisdiction over state law claims after plaintiff voluntarily dismissed claims arising under federal law). The Court finds no compelling reasons to retain jurisdiction over Ms. Villalva's state-law tort claims. Thus, the Court will dismiss Ms. Villalva's state-law tort claims without prejudice because of a lack of jurisdiction. *See* Colo. Rev. Stat. § 13-80-111 (permitting claims properly commenced within the statute of limitations to be re-filed if involuntarily

dismissed because of lack of jurisdiction).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant's Motion for Summary Judgment [Docket No. 18] is **GRANTED** in part and **DENIED** in part.  It is further

**ORDERED** that defendant's Motion for Summary Judgment [Docket No. 18] is **GRANTED** as to plaintiff's gender discrimination, hostile work environment, and retaliation claims.  It is further

**ORDERED** that plaintiff's state-law claims are dismissed without prejudice.  It is further

**ORDERED** that the Trial Preparation Conference scheduled for December 30, 2013 and the trial set for January 14, 2014 are **VACATED**.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendant may have its costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is closed in its entirety.


DATED December 23, 2013.

BY THE COURT:


 s/Philip A. Brimmer                            
PHILIP A. BRIMMER
United States District Judge